## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KALAMAZOO PEACE CENTER,** | ) | |
| **JESSICA CLARK, and** | ) | |
| **NOLA WIERSMA,** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| v. | ) | **COMPLAINT FOR INJUNCTIVE** |
| | ) | **AND DECLARATORY RELIEF** |
| **JOHN M. DUNN,** | ) | **AND DAMAGES** |
| **LAURA M. THOMAS,** | ) | |
| **JAN VAN DER KLEY,** | ) | **JURY TRIAL DEMANDED** |
| **ROBERT J. BROWN,** | ) | |
| **BLAINE D. KALAFUT,** and | ) | |
| **DIANE ANDERSON,** | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Kalamazoo Peace Center, Jessica Clark, and Nola Wiersma complain of Defendants and allege:

## I.    INTRODUCTION

1.     "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).  This is particularly true of public universities, where "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding."  *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).  The United States Supreme Court has thus made clear that "state colleges and universities are not enclaves immune from the sweep of the First Amendment," and that the freedoms of speech, assembly, and petition must be zealously guarded as "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'"  *Healy v. James*, 408 U.S. 169, 180 (1972).  In the face of these bedrock principles,

Western Michigan University ("WMU") officials restrict speech on campus by limiting access to campus facilities based on the anticipated content of speech and by assessing indeterminate sliding-scale "security" fees that amount to a tax on controversy. WMU also enforces unconstitutional "posting" policies and guidelines that eliminate spontaneous dissemination of written communications on campus.

2.      Plaintiffs Kalamazoo Peace Center, Jessica Clark, and Nola Wiersma (collectively, "KPC") are a student and community group and its co-directors at WMU who sought in 2014 to host Boots Riley, noted musician, activist, and progressive labor advocate, to present a keynote speech on ideas and tactics to advance social justice. WMU initially denied KPC's request to hold the event at Sangren Hall, located in the center of campus, and then clarified that it would not allow the event at any campus venue. After KPC asked University officials to reconsider their position, WMU decreed the event could take place on campus, but only if KPC paid for the presence of police officers as "security" for the lecture. WMU imposed this requirement and set the fee to pay the officer based solely on the speculative campus reaction to Mr. Riley's anticipated remarks. Rather than pay the arbitrary fee, for which it had not budgeted in any case, KPC was forced to hold the event at a less desirable non-university venue.

3.      In addition, WMU requires that a university official approve any flyer advertising an event, and forbids campus groups from posting any announcements until the activity has been approved. The delay caused by Defendants' professed security concerns meant that KPC could not publicize the Riley event, further stifling KPC's efforts to fulfill its mission of increasing awareness of social justice.

4.       Accordingly, this is a civil rights action to protect and vindicate the First and Fourteenth Amendment rights of KPC and all students at WMU.  By policy and practice, Defendants unlawfully restrict WMU students' constitutional rights to free expression and have acted in the past to restrict the Plaintiffs' constitutional rights.  WMU's policies and enforcement practices are challenged on their face and as applied to Plaintiffs Kalamazoo Peace Center, Jessica Clark, and Nola Wiersma.  This action seeks declaratory and injunctive relief, damages, and attorneys' fees.

## II.       JURISDICTION AND VENUE

5.       This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

6.       This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

7.       The Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, and to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.  The Court is authorized to award attorneys' fees and costs pursuant by 42 U.S.C. § 1988.

8.       Venue is proper in the United States District Court for the Western District of Michigan pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred within this District and because at least one Defendant resides in this District.

## III.       PLAINTIFFS

9.       Plaintiff Kalamazoo Peace Center is a non-profit organization and a Registered Student Organization ("RSO") at WMU.  Although it is an independent organization, it is located on the WMU campus in the Wesley Foundation, which is both an RSO and the campus affiliate

of the United Methodist Church. KPC operates on a collaborative basis, in which WMU students and non-student staff work together in a "collective" to fulfill KPC's mission: educate and empower students by providing knowledge, tools, and space needed to mobilize around issues of justice and peace and for effecting positive change on campus and in the community. KPC organizes lectures, film screenings, concerts, open forums, and other events to bring together diverse ideas and provide a space for discourse and political development.

10. KPC is led by two co-directors, Jessica Clark and Nola Wiersma.

11. Jessica Clark coordinates events, oversees the capital campaign, develops new projects, conducts research and maintains the Center's website.

12. Nola Wiersma communicates and networks with collective members to advance Peace Center projects and stage events.

## IV. DEFENDANTS

13. Defendant John M. Dunn is the President of Western Michigan University. He is WMU's chief executive officer, responsible for WMU's administration and policy-making, and has ultimate authority to approve the policies and procedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights. Defendant Dunn acted under color of state law and is sued for injunctive relief in his official capacity. *Ex parte Young*, 209 U.S. 123 (1908).

14. Defendant Laura M. Thomas is an Associate Registrar at Western Michigan University. Defendant Thomas acted under color of state law and is sued in both her personal and official capacities. *Ex parte Young*, 209 U.S. 123 (1908).

15. Defendant Jan Van Der Kley is Vice President for Business and Finance and Treasurer for the Board of Trustees at Western Michigan University. Defendant Van Der Kley

4

acted under color of state law and is sued in both her personal and official capacities.  *Ex parte Young*, 209 U.S. 123 (1908).

16.     Defendant Robert J. Brown is the Director/Chief of the Department of Public Safety at Western Michigan University.  Defendant Brown acted under color of state law and is sued for injunctive relief in his official capacity.  *Ex parte Young*, 209 U.S. 123 (1908).

17.     Defendant Blaine D. Kalafut is the Deputy Chief of the Department of Public Safety at Western Michigan University.  Defendant Kalafut acted under color of state law and is sued in both his personal and official capacities.  *Ex parte Young*, 209 U.S. 123 (1908).

18.     Defendant Diane Anderson is the Vice President for Student Affairs and Dean of Students at Western Michigan University.  Defendant Anderson acted under color of state law and is sued for injunctive relief in her official capacity.  *Ex parte Young*, 209 U.S. 123 (1908).

## V.     STATEMENT OF FACTS

19.     Kalamazoo Peace Center, like all RSOs at WMU, is governed by the *RSO Handbook* (relevant sections attached as Exhibit A).  The *RSO Handbook* establishes procedures for using campus facilities for expressive events, as well as the conditions for such use.

20.     Organizations that qualify as RSOs are accorded certain privileges, including access to funding and the ability to use campus facilities for scheduled events.

### A.     Defendants' Application of the Room Reservation and Event Security Policies to Censor KPC's 35th Annual Peace Week Keynote

21.     Plaintiff Kalamazoo Peace Center engaged musician, activist, and progressive labor advocate Boots Riley to give a keynote speech to celebrate its 35th Annual Peace Week, scheduled for April 3, 2014.  As a musician, Mr. Riley's lyrics are characterized by literary references that critique capitalism, exploitation, and police brutality.

5

22. On March 3, 2014, the earliest possible date under the RSO Handbook Room Reservation Policy, KPC member Ashlee Daraban submitted a room request to WMU's Registrar's Office for the April 3 event using the Student Activities and Leadership Programs ("SALP") website reservation form. The request specified that the event was to be held April 3, 2014, from 6:00 to 9:00 p.m., for up to 200 attendees, and listed three preferred lecture halls from which the Registrar was requested to assign for KPC's use. KPC described the event by stating: "The speaker, Boots Riley, will come to talk about issues related to class structure and racism."

23. Four days after the request was submitted, the Associate Registrar, Defendant Thomas, requested that KPC provide Riley's résumé and identify the university or venue where he last spoke.

24. Daraban promptly provided additional information about Riley, a link to his public speaking home page, and further informed the Registrar that Riley had previously spoken at California State University Northridge, Concordia University in Montreal, and the California Institute of Technology.

25. Defendant Thomas responded that, while the Registrar's office appreciated Daraban's "promptness" in providing the additional information, the Registrar was "not able to accommodate" KPC's room reservation request "at this time."

26. When Daraban sought clarification whether no rooms were available or only that the rooms specified in the request were booked, Defendant Thomas responded on March 13 that "[t]he decision was made, in conjunction with public safety, that [WMU] will not reserve a room on campus for this event."

27.     Former KPC Director and Board Member Sasha Acker then called Defendant Blaine Kalafut, WMU's Deputy Chief of the Department of Public Safety, to inquire why the Riley event could not be held on campus.

28.     Defendant Kalafut responded that KPC could not have the event on campus because Riley had previously caused a disturbance and his presence on campus had the potential to create a dangerous situation.

29.     Defendant Kalafut also stated that his Department ran background checks on certain speakers invited to campus and had weekly meetings with the FBI, with which his Department had a "great relationship."

30.     On information and belief, Defendant Kalafut told Defendant Thomas that Riley could not appear on WMU's campus because "he or people he is associated with" caused trouble at the Miller Auditorium in the past.

31.     Acker asked Defendant Kalafut to provide more details on Riley's alleged previous appearance at WMU and to explain the basis for his claim that Riley or an associate had been involved in some kind of "incident."

32.     Defendant Kalafut responded by email on March 14 that, to his knowledge, Riley had never been to WMU but that his Department had "to make sure we take any necessary precaution to make sure our students and staff are safe."

33.     Although he acknowledged that Riley would not necessarily "cause any harm to anyone on campus" Defendant Kalafut cautioned "some messages can be controversial," and that "we need to be proactive to make sure the event is safe for all."

34.     Despite having taken the position that the event could not take place, Defendant Kalafut told Acker that he had requested additional information from Riley's booking agent

about "past University visits," and that "more discussion will take place regarding this event" after he received a response.

35.     In response to Defendant Kalafut's inquiry, Riley's booking agent confirmed that Riley had appeared previously at Cal Tech, California State Northridge, and Concordia University.  Defendant Kalafut then asked Riley's booking agent to provide a police contact at Cal Tech.

36.     Defendant Kalafut told KPC that Defendant Jan Van Der Kley had instructed the Registrar's Office to deny KPC's room request.  Based on this information, Riley's booking agent asked Defendant Van Der Kley to explain why the room request was denied.

37.     Defendant Van Der Kley denied having previous knowledge of a decision to deny KPC's room request.

38.     Defendant Van Der Kley has "global oversight for facilities management, public safety, human resources, contract administration and financial activities of the University, including responsibility for the investment and management of endowments, planned gifts and working capital."

39.     Daraban of KPC also met with Paul Terzino, Director of the Bernhard Center, WMU's student center, to see if the event could be held there as an alternate venue.

40.     Terzino explained that Defendant Kalafut was conducting a background security check on Riley, and that the response would determine how much security KPC would need for its event.  Terzino's statement was the first time KPC was told that security would be required, and that the Center would have to pay the $62/hour cost for it.

41.      KPC had received funding for the Annual Peace Week keynote from the Western Student Association, an organization that allocates funds to RSOs out of WMU

student assessment fees. However, at the time it applied for funding, KPC had no idea security requirements would be imposed, and had not budgeted for such unforeseen expenses.

42. Furthermore, paying for a police presence at an annual Peace Week event was contrary to the KPC's mission and values.

43. Unable to accede to WMU's demand that it pay for a police officer to provide security for the Boots Riley event, KPC was forced to hold the event at the Wesley Foundation.

44. Accordingly, Mr. Riley's KPC 35th Annual Peace Week keynote was held on April 3, 2014 in the Wesley Foundation basement. The location was smaller than, and acoustically inferior to, lecture halls at WMU. The building also is not handicapped-accessible, preventing an important segment of KPC's constituency from attending the event.

45. In addition, because of WMU's burdensome system for approving flyers, KPC was not able to advertise the Boots Riley event until very close to the event date, as WMU will not approve a flyer that does not include the place of the event.

46. Instead of having most of a month to advertise Mr. Riley's appearance, KPC had only days because of WMU's initial refusal to allow the event, followed by its demand that KPC pay for security.

47. KPC's efforts to publicize its event were further delayed because different locations on campus have different approval processes.

48. The KPC 35th Anniversary keynote was held without police presence. The presentation and discussion took place without any type of disruption.

**B. WMU's Room Reservation Policy**

49. RSOs may reserve campus facilities for their events by submitting a room reservation form on the Student Activities and Leadership Programs ("SALP") website.

50.     WMU makes classrooms and lecture halls with audiovisual capabilities available to RSOs pursuant to this policy.  Such facilities are assigned for RSO use on a "first-come, first-served basis."

51.     Guidelines for RSOs posted on the SALP webpage provide that "[m]ost academic lecture halls with audiovisual capabilities may be reserved no more than one month in advance to provide opportunities for all organizations to utilize these spaces."  The guidelines impose no other preconditions for scheduling facilities by RSOs.

52.     The facilities reservation form for RSOs does not request any information related to potential security issues.  Nor does it suggest that facility use may be denied for any reason other than availability during the time requested.

### C.     WMU's Event Security Policy

53.     A section of the *RSO Handbook* relating to event planning addresses security. The Event Security Policy states that RSOs "may need to request security services" for events, but does not set forth any criteria for an RSO to determine when security services "may" be "needed."  Nor does the Event Security Policy indicate that WMU may decide unilaterally that security is necessary or impose any restrictions on WMU as to when it can insist upon security services for an RSO event.

54.     WMU's Event Security Policy consists of a single paragraph in the *RSO Handbook* stating:

> RSOs may need to request security services from the WMU Department of Public Safety for a particular event. Generally, these services must be requested a minimum of ten (10) days prior to the planned event.  Moreover, these services must be paid for in advance by cash, certified check, money order, or by a campus financial transaction. The WMU Department of Public Safety staff makes the final decision on the number of officers needed for each scheduled event to maintain campus safety and security.

55.     Although requests for security services must be made at least 10 days before a planned event, the Event Security Policy does not impose any deadlines for WMU to inform RSOs whether security services will be required.  When WMU makes a decision to impose a security requirement unilaterally, no provision of the policy requires that it be decided sufficiently in advance of an event in order for the RSO to satisfy the 10-day requirement, to budget for security fees, or to dispute whether security services are even necessary.

56.     The Event Security Policy requires fees for security services to be paid in advance, but does not specify any criteria or formula for determining how much the fee should be for any given event.  The policy states only that the WMU Department of Public Safety shall determine the number of officers required for each event.  No specific charge per officer is stated, nor are any criteria established for determining the number of officers that may be required.

57.     The Event Security Policy does not provide any avenue to appeal a decision that security services are required or the amount to be charged, stating that the WMU Department of Public Safety shall make a "final decision" in the first instance.

58.     WMU's Deputy Chief of the Department of Public Safety, Defendant Blaine Kalafut, has stated that whether to require "security" at RSO on-campus events is determined "case-by-case."

59.     Defendant Kalafut has further stated that the WMU Department of Public Safety's "case-by-case" determinations are made based on the history of a speaker or performer and possible disruptions during the presentation or performance.

60.     Defendant Kalafut has explained that security requirements are imposed for speakers when they are "controversial," and have "a message" or "a political stand" to which "there are dissenting views."

61.     On information and belief, Defendant Kalafut did not want Boots Riley appearing at WMU because of Riley's association with the "Occupy Movement" in 2011 and 2012, a famously decentralized form of protest.

62.     In August 2012, KPC hosted the Occupy National Gathering at the Wesley Foundation, located on the WMU campus, over the objection of the Defendants.

63.     On information and belief, although Boots Riley participated in activities associated with the "Occupy Movement" in 2011 and 2012, he did so in Oakland, California, more than 2,250 miles away from Kalamazoo, Michigan.

**D.     The Ongoing Impact of WMU's Room Reservation and Event Security Policies on Plaintiffs**

64.     Plaintiffs wish to engage in expressive activities similar to Mr. Riley's keynote speech in the future, without having to pay "security" fees.

65.     Plaintiffs fear Defendants will continue to apply their Room Reservation and Event Security policies in ways that impede future KPC events.

66.     As interpreted and enforced by the Defendants, WMU's Room Reservation and Event Security policies afford administrators unbridled discretion, enable them to restrict access to WMU property, and to impose arbitrary fees, without any specific parameters for whether to set fees, or in what amount(s).

67.     The fees WMU imposes under its Event Security Policy are content-based. They are predicated on a standardless assessment of whether a given speaker is likely to be

"controversial" or to draw "dissent," and on the anticipated reaction to the speaker's presentation.

68.    Given the arbitrary nature of the Event Security Policy, KPC can effectively avoid uncertainty over whether it has sufficient funds for an event only by inviting speakers or performers who are not "controversial" or who will not trigger "dissenting views."

69.    Defendants' policies and actions create a hostile atmosphere for free expression on campus, chilling the speech of other WMU RSOs, as well as students, who are not before the Court.

### E.    Western Michigan University's Posting Policies

70.    The *RSO Handbook* also sets forth "Flyer/Poster Posting Guidelines" that restrict how RSOs and students may post literature on the WMU campus.

71.    The Flyer/Poster Guidelines state that "[w]hile WMU promotes freedom of expression, [it] also affirms civility" and "expects that poster … content will conform to established requirements and generally accepted standards of good taste."  The terms "civility" and "good taste" are not defined.  WMU also explicitly "reserves the right to control conditions of time, place, and manner under which posters and literature are distributed."

72.    Under the Flyer/Poster Guidelines, SALP must approve all postings, and they must be placed on approved bulletin boards provided by the University.

73.    Any RSO wishing to post flyers or posters must submit the proposed flyer or poster to SALP at least seven business days before the event that the flyer or poster promotes. The Guidelines state that the SALP approval process may take two full business days.

74.    Under these Guidelines, flyers and posters for impromptu expression or impromptu expressive activities may not be posted because there is no mechanism for immediate approval.

13

75.     All postings must contain the full name of the sponsoring organization, and the date, time, and event location.  Programs or projects sponsored in whole or part by student activities funds must include the statement "SAF Funded" on all postings about those programs or projects.

76.     SALP stamps all flyers and posters "Approved" before they can be posted. Material without an approved stamp is removed and the offending student group is charged for removal costs.

77.     Furthermore, additional steps are required to post flyers at buildings with high numbers of visitors.

78.     If a RSO would like to advertise an event at the Bernhard Center, SALP must approve the flyer and then the students must take copies to Student Activities and Leadership Programs Office.

79.     Any signs to be posted in the Student Recreation Center ("SRC") must first be approved by SALP but then taken to University Recreation.  No more than 12 flyers may be submitted for posting.

80.     Only Residence Life personnel may post flyers on the bulletin boards in residence hall corridors once they have been stamped "Approved" by the Office of Residence Life.  No postings are permitted on any residence hall walls, windows or other non-bulletin board surfaces in public areas, nor may postings be slid under room doors unless authorized by Residence Life.

81.     Violations of the *RSO Handbook*, including of its Flyer/Poster Guidelines, are subject to sanctions, up to and including loss of RSO privileges or loss of RSO recognition, as well as potential further "discretionary sanctions."

82.     As with all rules and policies set forth in the *RSO Handbook*, WMU reserves authority to make "[r]easonable changes … without notice" to the Flyer/Poster Guidelines.

## VI.     CAUSES OF ACTION

### COUNT I

**As-Applied Violation of Plaintiffs' Rights to Free Speech Under
the First and Fourteenth Amendments (42 U.S.C. § 1983) – Room Reservation Policy
<u>(Defendants Van Der Kley, Kalafut, and Thomas)</u>**

83.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

84.     The First and Fourteenth Amendments extend to campuses of state colleges and universities.  *Healy v. James*, 408 U.S. at 180.

85.     Although RSOs at WMU are allowed to schedule the use of campus facilities with audiovisual capabilities for on-campus events, Defendant Laura Thomas initially told KPC that its request for space for its 35th Annual Peace Week keynote was being denied.

86.     The *RSO Handbook* provides that such space is to be made available on a first come-first served basis and does not authorize WMU officials to deny space based on other considerations.

87.     Defendant Thomas required KPC to provide additional information about the proposed event beyond what is specified in the official reservation request forms, including Mr. Riley's résumé and a listing of the universities where he last appeared recently.  After KPC promptly provided this information, Defendant Thomas informed Plaintiffs that the Registrar was "not able to accommodate" KPC's room reservation request.  When asked for an explanation, Defendant Thomas said that "[t]he decision was made, in conjunction with public safety, that [WMU] will not reserve a room on campus for this event."

88.     Defendant Kalafut contacted Boots Riley's booking agent and requested information about Riley's earlier campus appearances, even asking that the agent give him the number for the campus police at the University of California (Northridge).

89.     Defendant Kalafut also told KPC that once he received the information from Riley's booking agent, "more discussion will take place regarding this event."

90.     On information and belief, Defendant Kalafut implemented the decision on whether to allow Riley to appear at a WMU facility.

91.     Defendant Van Der Kley is responsible for setting WMU's security policies and overseeing the campus public safety department. Defendant Kalafut stated that Defendant Van Der Kley made the decision to deny KPC a room reservation.

92.     Defendants' initial decision to deny KPC lecture hall space for its 35th Annual Peace Week keynote rested entirely on anticipated reaction to Boots Riley's appearance and was impermissibly content-based. *Healy*, 408 U.S. at 185-86 (government cannot deny rights and privileges "solely because of a citizen's association with an unpopular organization").

93.     Defendants Van Der Kley, Kalafut, and Thomas violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

94.     The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT II

### As-Applied Violation of Plaintiffs' Rights to Free Speech Under the First and Fourteenth Amendments (42 U.S.C. § 1983) – Event Security Policy (Defendants Van Der Kley, and Kalafut)

95.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

96.     Regulations requiring a permit and fee before authorizing public speaking are prior restraints on speech that are presumptively unconstitutional. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

97.     Such fees cannot be based on the level of hostility government officials imagine may be engendered by speech, or on the anticipated listeners' reaction to the speech. *Id*. at 134-35. Regulations requiring permits and/or imposing fees are impermissibly content-based if they permit a determination of fee amount grounded on such factors, even if the amount is tied to the predicted administrative expense or the cost of maintaining public order. *Surita v. Hyde*, 655 F.3d 860, 876 (7th Cir. 2011) (citing *Forsyth Cnty.*).

98.     Any ordinance that imposes a fee upon the exercise of First Amendment rights must be content-neutral, strictly limited to recouping actual administrative costs, and bounded by narrowly drawn, reasonable and definite standards.

99.     Defendant Kalafut has stated that whether to require "security" at RSO on-campus events is determined "case-by-case" based on whether speakers are expected to be "controversial," or to convey "a message" or "a political stand" to which "there are dissenting views."

100.    Defendant Van Der Kley oversees the Public Safety Department at WMU that is charged with implementation and enforcement of the Event Security Policy challenged herein. Defendant Van Der Kley made the decision to deny KPC room access based on the security policy.

101.    Defendants' application of the *RSO Handbook*'s Event Security Policy to Plaintiffs to require the payment of $186 in security fees, based on a supposed need for a security

officer at the keynote, rested entirely on anticipated reaction to Boots Riley's appearance, and was thus impermissibly content-based.

102.    WMU's policy flaunts long-standing Supreme Court precedent holding that such fees, if lawful at all, cannot "depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content." *Forsyth Cnty.*, 505 U.S. at 134.  "Listeners' reaction to speech is not a content-neutral basis for regulation" and "cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Id.* at 134-35.  These principles plainly apply to scholastic settings. *E.g.*, *Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, No. 2:11–cv–15481, 2013 WL 3148272, at *7 (E.D. Mich. June 19, 2013).

103.    Defendants followed no discernible criteria in determining whether security was necessary for KPC's event, and set the amount of the fee through the exercise of unbridled discretion.

104.    KPC was given no opportunity to challenge either Defendants' conclusion that security was necessary for the Boots Riley keynote event or that the amount of the fee was arbitrary and excessive.

105.    By imposing speaker- and content-based fees as a condition to allowing KPC to use a WMU lecture hall for the 35th Annual Peace Week keynote speech, Defendants violated Plaintiffs' rights to free expression.

106.    Defendants Van Der Kley and Kalafut violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiff under 42 U.S.C. § 1983.

18

107.     The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.  Additionally, Plaintiffs Clark and Wiersma experienced emotional injury as a consequence of being denied their First Amendment rights.

108.     Plaintiff is entitled to a declaration that Defendants violated their First Amendment rights.  Additionally, they are entitled to damages in an amount to be determined by the evidence and this Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### COUNT III

**Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs'
First and Fourteenth Amendment Rights (42 U.S.C. § 1983) – Event Security Policy
(Defendants Dunn, Brown, Van Der Kley, and Kalafut)**

109.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

110.     WMU's Event Security Policy imposes a presumptively invalid prior restraint on speech.  *Forsyth Cnty.*, 505 U.S. at 130; *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012).

111.     Regulations that grant an administrative body or government official unfettered discretion to regulate the licensing of activities protected by the First Amendment are unconstitutional.  *Kunz v. New York,* 340 U.S. 290, 294 (1951).  Such unrestricted discretion increases the likelihood that the government official may discriminate based upon the content of the "speech" or the viewpoint of the speaker.  *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 763-64 (1988).

112.     WMU's Event Security Policy gives its Department of Public Safety and Registrar unfettered discretion to determine when "RSOs *may* need to request security services" in order to secure on-campus space to hold events that feature or include expressive

activity. This empowers public officials to administer the policy on the basis of impermissible factors or through arbitrary application.

113. WMU's Event Security Policy gives its Department of Public Safety unfettered discretion to determine the amount of "security" fees that RSOs must pay in order to secure on-campus space to hold events that feature or include expressive activity. This enables public officials to impose an arbitrary tax on controversy.

114. WMU's Event Security Policy governing expression is unconstitutionally overbroad, does not serve a significant governmental interest, is not narrowly drawn, and impermissibly restricts student expression. It burdens far more speech than is necessary to serve the asserted interest of maintaining campus safety and security.

115. WMU's Event Security Policy restricting speech fails to provide notice of the obligations that the policy creates, and is unconstitutionally vague on its face in violation of the First Amendment and of the due process guarantee of the Fourteenth Amendment to the U.S. Constitution.

116. Under WMU's policy Defendant Kalafut determines "case-by-case" whether to impose security requirements based on his assessment of a particular speaker or performer. Security requirements are imposed for speakers considered to be "controversial," that have "a message" or "a political stand," and to whom "there are dissenting views."

117. Defendant Brown oversees implementation and enforcement of the Event Security Policy challenged herein.

118. Defendant Van Der Kley oversees the Department of Public Safety that implements and enforces the Event Security Policy challenged herein.

119.    Defendant Dunn is responsible for WMU's administration and policy-making, and has ultimate authority to approve the Event Security Policy challenged herein.

120.    As a direct result of the Defendants' Event Security Policy, RSOs and students at WMU are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

121.    As a legal consequence of the Defendants' violation of Plaintiffs' and other similarly situated RSOs' First and Fourteenth Amendment rights, as alleged above, and of WMU students, all of which is irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### COUNT IV

**Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs'
First and Fourteenth Amendment Rights (42 U.S.C. § 1983) – Flyer/Poster Guidelines
(Defendants Dunn and Anderson)**

122.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

123.    Students have a First Amendment right to engage in expressive activities and to distribute written materials in public areas of a state university without obtaining advance permission from government officials.  *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981); *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667 (1973).

124.    Advance notice and permitting requirements significantly burden freedom of speech.  WMU's Posting guidelines and policies impose a presumptively invalid prior restraint on speech.  *Forsyth Cnty.*, 505 U.S. at 130; *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012).

125. Any such permitting requirement violates the First Amendment unless it contains narrow, objective, and definite standards to guide the licensing authority. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969).

126. Restrictions on expressive activity are void for vagueness if their terms are not clearly defined such that a person of ordinary intelligence can readily identify the standards to be applied. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

127. WMU's Flyer/Poster Guidelines and policies impose a prior restraint. Posters are restricted to approved bulletin boards in academic and general buildings, but they may not be placed there without SALP approval and an "Approved" stamp on the poster.

128. WMU's Flyer/Poster Guidelines and policies unconstitutionally prohibit RSOs and students from engaging in spontaneous postings and/or promoting impromptu expressive events due to the requirement to seek permission for posting from SALP at least seven days in advance and to allot additional time for necessary university approval – two days for SALP and an undefined period for the Office of Residential Life.

129. WMU's Flyer/Poster Guidelines are vague insofar as their requirements that posters must "conform to requirements of generally accepted standards of good taste" without defining those standards.

130. WMU's Flyer/Poster Guidelines lack criteria to guide SALP's decisions whether to approve posters and gives SALP the authority to deny approval for failure of posters to comport with an undefined "civility" requirement.

131. The prior restraints of the WMU Flyer/Poster Guidelines also apply to signs to be posted in campus residence halls, which the Office of Residence Life must approve and post. The policies also limit alternative channels of communication such as sliding flyers

under residence hall room doors and/or posting in common areas other than corridor bulletin boards.

132. Defendant Dunn is responsible for WMU's administration and policy-making, and has ultimate authority to approve the Flyer/Poster Guidelines challenged herein.

133. Defendant Anderson oversees implementation and enforcement of the Flyer/Poster Guidelines challenged herein.

134. As a direct result of the Defendants' Flyer/Poster Guidelines, RSOs and students at WMU are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

135. Violation of Plaintiffs' First and Fourteenth Amendment rights is irreparable injury *per se*. Consequently, Plaintiffs are entitled to declaratory and injunctive relief, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## COUNT V

### Declaratory Judgment and Injunction (28 U.S.C. § 2201, et seq.)

136. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

137. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiffs' rights under the United States Constitution. A judicial declaration is necessary and appropriate at this time as to Counts I through IV above.

138. Plaintiffs desire a judicial determination of their rights against Defendants as they pertain to Plaintiffs' right to speak without being subjected to content-based facilities access requirements, Event Security policies, and/or Flyer/Poster Guidelines that impose prior restraints on speech, give school officials unfettered discretion whether to allow expression and

under what conditions, and that are vague, overbroad, and not narrowly tailored to serve a substantial governmental interest.

139.    To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring WMU's Event Security policies and Flyer/Poster Guidelines unconstitutional.

140.    Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction prohibiting the Defendants from enforcing their restrictions on Plaintiffs' expressive activities to the extent they are unconstitutional, to prevent the ongoing violation of Plaintiffs' constitutional rights.   Plaintiffs and their fellow RSOs, and WMU students, are suffering irreparable harm from continued enforcement of WMU's unconstitutional policies, monetary damages are inadequate to remedy their harm, and the balance of equities and public interest both favor a grant of injunctive relief.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Kalamazoo Peace Center, Jessica Clark and Nola Wiersma respectfully requests that the Court enter judgment against Defendants and provide Plaintiffs the following relief:

A.    A declaratory judgment stating that Defendants' Events Security policy and Flyer/Poster Guidelines, facially and as-applied to Plaintiffs, and the Room Reservation Policy as-applied to Plaintiffs, are unconstitutional facially and as-applied, and that they violate Plaintiffs' rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

B.      A permanent injunction restraining enforcement of Defendants' unconstitutional Events Security policy and Flyer/Poster Guidelines and their underlying enforcement practices, and of Defendants' unconstitutional enforcement of their Room Reservation Policy;

C.      A declaratory judgment that Defendants' censorship of Plaintiffs' expressive activity violated their First and Fourteenth Amendment rights;

D.      Monetary damages in an amount to be determined by the Court to compensate Plaintiffs for the impact of a deprivation of fundamental rights;

E.      Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988, and other applicable law; and

F.      All other further relief to which Plaintiffs may be entitled.

## VIII.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues properly triable by jury in this action.

DATED:  October 20, 2014

Respectfully submitted,


ROBERT CORN-REVERE
  (*motion for admission pending*)
  bobcornrevere@dwt.com
RONALD G. LONDON
  ronnielondon@dwt.com
LISA B. ZYCHERMAN
  lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC  20006
Telephone: (202) 973-4200


By:   /s/ Matthew J. Hoffer
    BRADLEY SHAFER
     brad@bradshaferlaw.com
    MATTHEW J. HOFFER
     matt@bradshaferlaw.com
    SHAFER & ASSOCIATES, P.C.
    3800 Capital City Blvd, #2
    Lansing, MI  48906-2110
    Telephone: (517) 886-6560


Attorneys for Plaintiffs Kalamazoo Peace Center,
Jessica Clark, and Nola Wiersma